**SIGNED THIS: January 25, 2018**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: | ) |
| | ) |
| EM LODGINGS, LLC, | )    Case No.   17-80150 |
| | ) |
| | ) |
| Debtor. | ) |
| | ) |

**O P I N I O N**

This matter is before the Court following an evidentiary hearing on a stay relief motion. The Debtor owns a hotel located in East Peoria, Illinois, operating as a Fairfield Inn, a Marriott brand in the limited service category. The Debtor filed a Chapter 11 petition on February 6, 2017, and has continued to operate the hotel as a debtor in possession since that time. The largest creditor is National Cooperative Bank (NCB) which holds a first mortgage on the hotel real estate as well as a blanket security interest covering most of the personal property, including rents.

Seven months into the case, on September 11, 2017, with the Debtor not having filed a plan of reorganization, NCB moved for relief from the automatic stay under section 362(d)(2),

alleging that the Debtor does not have equity in the hotel property and that the property is not necessary to an effective reorganization. NCB had previously filed Claim 12-1 asserting a petition date loan balance of $7,259,253.67, which sum includes a prepayment premium of $70,828.67. In the proof of claim, NCB valued its collateral at $5,100,000. On December 21, 2017, NCB filed an amended proof of claim, Claim 12-2, asserting a total balance due as of December 20, 2017, of $7,898,155.21. The amended claim increased the stated value of NCB's collateral to $5,700,000.

    In response to the motion, the Debtor takes the position that the hotel property is worth more than the balance due NCB. Whether the Debtor has equity in the hotel property was the primary focus of the evidence presented at trial. The Debtor concedes that it has no intention of filing a plan of reorganization. Instead, the Debtor is hoping to refinance or sell the property for an amount sufficient to pay off NCB in full, but it has not filed a plan of liquidation or moved to sell or refinance the property.

    The trial on NCB's stay relief motion was held on December 22, 2017. Danny Balkam, a vice president specializing in troubled loans, testified on behalf of NCB. Mr. Balkam verified the accuracy of the proofs of claim filed by NCB and explained that the $5.7M valuation stated in the amended claim was based upon an updated appraisal. He testified that while NCB used appraiser Nina Owen from Chicago to appraise the property when the loan was initially made in 2013, its more recent appraisals were performed by appraiser Jonathan Jaeger from New York because of his hotel appraisal expertise.

    As its valuation expert witness, NCB called Mr. Jaeger, an MAI who is employed by LW Hospitality Advisors (LWHA), a national hotel consulting and valuation firm. He has been appraising hotels for the past ten years and has participated in approximately 1,500 hotel

appraisals. He first appraised the Debtor's hotel property for NCB as of May 1, 2017, assigning the property an "As Is Market Value" of $5,100,000 or $57,000 per room. His appraisal report defines Market Value to mean "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus." In his May 1, 2017 appraisal, Mr. Jaeger assigned the Debtor's hotel a stabilized occupancy rate of 63.0% as of May 1, 2019, a stabilized ADR (Average Daily room Rate) of $106.65 and a stabilized RevPAR (Revenue Per Available Room) of $67.19. For purposes of the income capitalization approach, Mr. Jaeger chose a discount rate of 11.50%, which is 50 basis points above the average of 11.00% from an investor survey conducted by Mr. Jaeger, reflecting his opinion that the subject property represents an above average risk level as perceived by potential investors.

In his updated appraisal, Mr. Jaeger assigned an "As Is Market Value" to the property as of December 1, 2017, of $5,700,000 or $64,000 per room. He incorporated an increased stabilized occupancy rate of 66.0%, a stabilized ADR of $107.12 and a stabilized RevPAR of $70.70. He maintained the same discount rate of 11.50%. He attributed the increased valuation to the hotel's significantly improved performance between March and November, 2017. Mr. Jaeger noted, however, the opinion of the regional manager of the Debtor's management company that the improved performance was attributable to problems that the two downtown Peoria Marriott hotels, the Pere Marquette and Marriott Courtyard, were having with Marriott. It was the manager's opinion that the short-term uptick in business was not sustainable if the Pere Marquette and Marriott Courtyard were able to work out their differences with Marriott and

retain the Marriott flag. This opinion was disputed by the Debtor's principal, Gary Matthews, who also holds an ownership interest in the Pere Marquette and Marriott Courtyard.

The historical performance data relied upon by Mr. Jaeger reflects a steady decline in the aggregate occupancy rate for the subject property and its competitive set from a high of 74.7% in 2012 to 62.5% for the trailing 12 months (TTM) as of October, 2017, with a corresponding decline in RevPAR from $78.17 to $65.67. He predicts that market-wide occupancy for that group will stabilize at 63.0% beginning in 2018 and remain static at that figure through the terminal year of 2027. Mr. Jaeger acknowledges that the Debtor's hotel is likely to continue to capture slightly more than its fair share of occupancy among its competitive set, stabilizing at 66.0%. Nevertheless, he is projecting area-wide demand for limited service hotels as flat from this point forward into the foreseeable future.

Nina Owen testified as the valuation expert for the Debtor. She is employed as vice president of CB Richard Ellis Inc. (CBRE), which she stated is the largest real estate company in the world. She works out of CBRE's Chicago office. She holds a masters of management in hospitality from Cornell University, is a state of Illinois certified general real estate appraiser, and is an associate member of the Appraisal Institute. She is a candidate for but has not yet obtained her MAI designation.

Ms. Owen previously appraised the subject property in 2013 on behalf of NCB when it refinanced the debt on the property. At that time, she appraised the value of the property at $11.2M. She has also appraised several other hotels in the Peoria area. In her current appraisal report, she assigns an "As Is Market Value" as of November 20, 2017, of $7,400,000 or $83,000 per room. She assigns an alternative "As Stabilized Market Value" as of November 20, 2019, of $8,500,000 or $95,000 per room.

Ms. Owen selected 71.0% as the stabilized occupancy figure for the subject property. She projects a stabilized ADR of $106.21 and a stabilized RevPAR of $75.41. For purposes of the discounted cash flow analysis, Ms. Owen is of the opinion that an investor purchasing the property "As Is" would likely use a discount rate of 11.00%, but once the property is stabilized, investors would thereafter apply a slightly lower discount rate of 10.50%. Her appraisal report indicates that these discount rates are near the middle of the range established by available sources, with emphasis placed on the data collected from a survey of market participants, who indicated a relevant range of between 9.50% and 12.00%.

The two appraisers also differed with respect to projected expenses. For the first stabilized year ending November, 2020, on room revenue of $2,302,956 Mr. Jaeger projected room expenses to be $685,116, yielding an expense ratio of 29.7% of revenue. On significantly higher projected room revenue of $2,456,304, Ms. Owen projected substantially lower room expenses of $598,455, an expense ratio of 24.4% of room revenue. As to undistributed operating expenses for the same year, Mr. Jaeger predicts a total of $736,784, while Ms. Owen predicts a total of $833,500. With respect to non-operating expenses, including management fee, property taxes, insurance and reserve for replacement, Mr. Jaeger projects a sum of $356,974, while Ms. Owen projects a sum of $335,626. From these inputs, Mr. Jaeger calculates hotel cash flow (net operating income or NOI), for stabilized year 1, to be $539,115. Due largely to her significantly higher projected occupancy rate and corresponding room revenue, as well as the lower projected rooms expense, Ms. Owen calculates NOI for stabilized year 1 to be $704,679.

The appraisers' ten-year projections of net cash flow from the Debtor's hotel operation, which are the foundation for the discounted cash flow analysis, are markedly different. Mr. Jaeger's cash flow projections begin with a figure of $471,701 for 2018, increasing gradually to

5

$660,714 in 2027 for an aggregate ten-year undiscounted cash flow of $5,774,597. Using a discount rate of 11.50%, he discounts the ten-year projected cash flow to $3,232,998. Assuming a sale at the end of the ten-year period, Mr. Jaeger discounts the net reversion value of $7,359,348 to a present value of reversion of $2,477,939. The sum of the present value of the discounted cash flow plus the present value of reversion is approximately $5.7M, his conclusion of As Is Market Value.

Ms. Owen's cash flow projections begin with a figure of $593,030 for 2018, increasing gradually to $860,615 in 2027, for an aggregate ten-year undiscounted cash flow of $7,480,800, which is $1,706,203 greater than Mr. Jaeger. She then applied a discount rate of 11.00%. Her report does not disclose the present value calculation of the ten-year cash flow or the present value calculation of the reversion value. The report concludes that the sum of those two present value amounts is $7,665,977, from which is deducted the amount of $281,296 for the remaining property improvement plan cost. This deduction yields an As-Is Value of $7.4M.

The reports and testimony of both appraisers are consistent in expressing the viewpoint that the valuation process attempts to re-create the thought process and analysis that a potential buyer of the hotel would use. Both appraisers believe that the most likely buyers and/or investors of the Debtor's hotel property would rely primarily upon a discounted cash flow analysis of the anticipated income stream from the property and, accordingly, they relied primarily upon the income capitalization/discounted cash flow approach to reach an opinion of market value. They both used the sales comparison approach to establish a probable range of value that had a limited purpose as a secondary confirmation of the value predicted by the income capitalization approach.

Mr. Jaeger's set of comparable sales included six hotels sold between February 2015 and October 2017, with four located in Illinois, one in Florida and one in Virginia. In his opinion, those six transactions established a sales comparison approach range from $61,000 to $67,000 per key (per room), which translates to a total consideration range for the Debtor's 89-room hotel from $5.4M to $6.0M, with the mid-point being $5.7M or $64,000 per room.

Ms. Owen's set of comparable sales included five hotels sold between December 2015 and February 2017, all located in Illinois. These transactions afforded a price per room range from $59,394 to $96,512. After adjustments for differences among the properties, she determined the relevant adjusted range to be $80,000 to $90,000 per room, which translates to a market value range for the Debtor's hotel of $7,120,000 to $8,010,000. Her value conclusion under the sales comparison approach, assuming completion of the pending property improvement plan (PIP) renovations, is $7.6M. After deducting the remaining cost for the improvement plan, she assigned a market value of $7.3M or $82,022 per room to the Debtor's hotel based upon the sales comparison approach.

Both appraisers included the Debtor's historical operating performance metrics as part of their appraisal reports. Mr. Jaeger's report includes data going back to 2011. The hotel's occupancy rate percentage since 2011 is reported as follows:

2011    75.8%

2012    77.5%

2013    74.4%

2014    73.3%

2015    69.8%

2016    65.8%

YTD Oct 2017    69.2%

TTM Oct 2017    65.9%

The hotel's ADR peaked in 2013 at $113.26 and has steadily declined down to $100.95 for TTM Oct 2017. The hotel's RevPAR peaked at $85.82 in 2012 and has declined to $66.52 for TTM Oct 2017.

**ANALYSIS**

Hotels are notoriously difficult for courts to value. Appraisal reports are dense and often difficult to compare. Appraisers casually throw around acronyms and hotel industry-specific terms of art that can be opaque to non-experts such as judges. While the basic valuation methods are well known, the application of those methods can vary among appraisers and valuation firms with little or no explanation of the particular nuances.

Bankruptcy courts, faced with the open-ended directive to determine value "in light of the purpose of the valuation and of the proposed disposition or use of such property" set forth in section 506(a)(1) of the Bankruptcy Code, have struggled to identify a rational rule of decision when confronted with competing appraisals that often reflect widely divergent opinions of value. Some courts pick and choose between the metrics used by each appraiser, effectively recomputing the valuation formula using their preferred metrics as the inputs. See *In re Tiat Corporation,* 2017 WL 161675 (Bankr. D. Kan.); *In re Hotel Associates, LLC,* 340 B.R. 554 (Bankr. D.S.C. 2006). Other courts adopt the value set forth in the appraisal that they find more persuasive, rejecting the competing appraisal entirely. See *In re Mt. Laurel Lodging Associates, LLP,* 2014 WL 1576971 (Bankr. S.D. Ind.). Other courts evaluate each appraisal on its merits in order to determine how much relative weight to accord each opinion of value, usually ending up

8

with a value figure somewhere in the middle. See *In re 210 Ludlow Street Corp.,* 455 B.R. 443 (Bankr. W.D. Pa. 2011).

This Court previously followed the latter approach in *In re Windsor Hotel, LLC,* 295 B.R. 307 (Bankr. C.D. Ill. 2003), with the belief that an appraisal by a competent and experienced appraiser, based on accepted valuation methodologies, should not easily be disregarded in the absence of clear error. Both Mr. Jaeger and Ms. Owen stressed that hotel appraisals, for the most part, involve metrics that are correlated with each other, such as occupancy rate, ADR and RevPAR. Both appraisers scoffed at the notion that an individual metric could be isolated and arbitrarily adjusted as a valid way of tweaking the value. The exceptions are the discount rate and the capitalization rate, which are independent variables intended to reflect the perceived investment risk of financing or purchasing the property.

The party requesting stay relief has the burden of proof on the issue of the debtor's equity in property. 11 U.S.C. 362(g)(1). Both appraisers gave two alternative value opinions, based upon two different sets of assumptions. Mr. Jaeger's primary value conclusion was $5.7M for "As Is Market Value" which is based upon a sale after a reasonable marketing and exposure period of 6 to 12 months.  His alternative valuation was "As Is Liquidation Value" which assumed a truncated marketing and exposure period of 90 days. In that case, he applied a 25% liquidation discount resulting in a value of $4,275,000. In this Court's view, the As Is Market Value applies the proper standard. NCB offered no evidence to indicate that granting stay relief would necessitate a quick sale. Mr. Jaeger's appraisal assumes that the hotel will remain operational, with the Marriott flag intact during the marketing period. In an effort to maximize its recovery, there is no reason why NCB would not use a commercially reasonable marketing period to liquidate its collateral. NCB's attorney made no argument to the contrary. So the Court

9

will consider as relevant the As Is Market Value of $5.7M and will disregard the As Is Liquidation Value of $4,275,000.

Ms. Owen determined the As Is Market Value of the hotel, as of November 20, 2017, to be $7.4M. Alternatively, she determined the As Stabilized Market Value, as of November 20, 2019, to be $8.5M. Both valuations assume Exposure/Marketing time of 6 months. Both appraisers considered the property, at present, as not stabilized and needing approximately two years to become stabilized. Both agreed that the property is presently underperforming relative to its expected performance once it becomes stabilized. Nevertheless, in the context of a stay relief motion, value is to be determined as of or near the date of the final hearing on the motion, which in this case was December 22, 2017. See *In re Deep River Warehouse, Inc.,* 2005 WL 1287987, at *8 (Bankr. M.D.N.C.); *TIAT Corporation,* 2017 WL 161675, at*7. So the Court will consider as relevant Ms. Owen's As Is Market Value of $7.4M and will disregard the As Stabilized Market Value of $8.5M. See *Hotel Associates,* 340 B.R. at 557-58 (court considered only the "as is" valuation, rejecting the "as stabilized" value, reasoning that the "as is" figure represents the value closest to the hearing date).

Under section 506(b) of the Bankruptcy Code, to the extent that an allowed secured claim is secured by property the value of which exceeds the amount of such claim, the claimant is entitled to interest on the claim plus any reasonable fees, costs, or charges provided for in the loan documents.  NCB's amended Claim 12-2 is for an amount that exceeds its initial claim by $638,902, which excess appears to be attributable to postpetition interest, fees, costs and charges that would be allowable only if NCB is determined to be oversecured. The allowance or disallowance of amounts under section 506(b) affects the amount of an allowed secured claim for

purposes of the bankruptcy case, but that determination has no preclusive effect in any subsequent bankruptcy case or non-bankruptcy litigation.

In this Court's view, the proper application of section 506(b) is set forth by the Fifth Circuit Court of Appeals in *In re T-H New Orleans Ltd. P'ship,* 116 F.3d 790 (5th Cir. 1997). Accord *In re SW Boston Hotel Venture, LLC,* 748 F.3d 393 (1st Cir. 2014). Adopting a flexible approach to section 506(b), the Fifth Circuit recognized that even though a secured creditor may be undersecured as of the petition date, where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, the creditor may, at some postpetition point in time, become oversecured. It is only at that point in time where the creditor's claim becomes oversecured that its entitlement to accrue interest, fees and costs under section 506(b) is triggered. Therefore, valuation of the collateral and a creditor's claim should be flexible and not limited to a single point in time. The entitlement under section 506(b) only applies during periods of time when the creditor is oversecured and only to the extent of the excess value. Interest, fees and costs accrued or incurred during periods of time when the creditor is undersecured are not allowable. The creditor bears the burden to prove its entitlement to postpetition interest, fees and costs, that is, that its claim was oversecured, to what extent, and for what period of time. *T-H New Orleans,* 116 F.3d at 798 (citing *In re Grabill Corp.*, 121 B.R. 983, 991-92 (Bankr. N.D. Ill. 1990)). The parties have correctly recognized this issue in their presentations.

Both appraisers are highly educated, well-credentialed individuals who are each employed by a premier firm in the industry. Their level of experience is substantial and comparable. Mr. Jaeger holds the MAI designation while Ms. Owen is a candidate to sit for the exam, so she had another appraiser who is an MAI from CBRE sign off on her report. She has

more experience appraising hotels in Illinois than Mr. Jaeger does. Their appraisal methodology is substantively similar, if not identical. His appraisal report is somewhat more polished and transparent than hers. In the end, the Court concludes that Mr. Jaeger and Ms. Owen are both competent hotel appraisers whose work product meets industry standards.

So how is it that two qualified experts using the same methodology and the same historical data can reach such widely disparate opinions of market value? (Since both appraisers denied being directed or influenced by their client's needs, the infamous "Made As Instructed" phenomenon appears not to have been at work here --- which the Court has no doubt about given the experience and qualifications of the appraisers). As indicated in their reports, the appraisers hold dramatically different views about the future performance of this hotel. Mr. Jaeger is relatively pessimistic while Ms. Owen is more optimistic. This difference is most salient in their projections for occupancy rates and net operating income over the next 10 years.

Mr. Jaeger's projected occupancy rate for 2018 is 65.0%. He increases his projection to 66.0% for 2019 and maintains that same projected rate through 2028. In his view, this hotel will never again approach the peak performance years of 2011 through 2014 when occupancy was between 73% and 77.5%. In contrast, Ms. Owen predicts an occupancy rate of 69.0% for 2018, 70.0% for 2019 and 71.0% for 2020 through 2028. In her view, while the hotel will not again reach the rates experienced during its peak performance years, it will rebound significantly from its nadir in 2016 to reach a stabilized rate of 71.0%, which is approximately halfway back to its best years of 2011 and 2012.

The appraisers also differed in their predictions about how efficiently the hotel will be managed in the future. According to Mr. Jaeger, in 2016 and TTM 2017, the hotel has experienced a much higher than industry average ratio of rooms expense to rooms revenue of

29.1% and 31.5%. The industry average ranges from 22.8% to 25.0%. He projects a stabilized rooms expense ratio of 29.7%. Ms. Owen projects a significantly lower stabilized expense ratio of 24.4%. This difference has a direct and significant effect upon the net operating income projections used by the appraisers in their discounted cash flow analysis.

There is no evidentiary basis for the Court to determine which set of projections is more valid or "correct." The appraisers are simply guessing about what the future holds. This fact is apparent in the disclaimers contained in the reports, which include the following:

> "The appraisals are based upon assumptions and estimates that are subject to uncertainty and variation. Data obtained in interviews with third parties are not always completely reliable. Assumptions as to the future behavior of consumers and the general economy are highly uncertain. Some assumptions will not materialize and unanticipated events may occur that will cause actual achieved operating results to differ from the predicted outcomes in material ways."

The uncertainty inherent in the discounted cash flow methodology, and the appraisal process generally, is also reflected in the changing valuations. Ms. Owens valued the property at $11.2M in 2013 and $7.4M in 2017. Mr. Jaeger valued the property at $5.1M in May of 2017 and seven months later at $5.7M as of December 2017. Were their earlier appraisals wrong or incompetent? Or were the later appraisals simply incorporating different data which influenced future projections which led to modified valuations? The appraisers themselves did not claim to have a crystal ball and rebuffed the idea that an appraiser's competency is validly judged by how accurate their past predictions of a hotel's future financial performance turned out to be. A competent appraiser is simply attempting to replicate the analytical process that market participants, buyers and investors, would engage in at a particular point in time, using the best data then available. The fact that actual future performance of a given hotel varies widely from that predicted in an appraisal, ordinarily says very little about the validity of the appraisal or the competency of the appraiser.

Under the discounted cash flow method, it is assumed that the property will be held for ten years and then sold. The cash flow or NOI is projected for eleven fiscal years. The first ten years of cash flow are discounted to present value using a discount rate chosen by the appraiser. The eleventh year's NOI is capitalized, using a capitalization rate (Exit Cap Rate) chosen by the appraiser, to estimate the reversion value in year 11 which is then also discounted to present value. The sum of the discounted values is the present market value.

To summarize and compare the appraisers' conclusions for the discounted cash flow analysis, Mr. Jaeger projects that the hotel's net operating income will steadily increase from $471,000 in 2018 to $660,000 in 2027. Using a discount rate of 11.50%, he calculates the present value of that cash flow to be $3,232,998. He calculates the gross reversion value of the hotel in 2028 by dividing the projected 2028 NOI of $682,826 by an Exit Cap Rate of 9.00% (.09) which equals $7,586,957, from which he deducts sale expenses of $227,609 to obtain the net reversion value of $7,359,348. He calculates the present value of the reversion value to be $2,477,939. The sum of the present value of the projected cash flow plus the present value of the hotel's reversion value is $5,710,937, which rounded off is $5.7M, his opinion of As-Is Market Value as of December, 2017.

Ms. Owen projects that the hotel's net operating income will steadily increase from $593,000 in 2018 to $860,000 in 2027. To discount that cash flow stream to present value, she used a discount rate of 11.00%. Although her report does not disclose the present value calculation as to the cash flow stream, by extrapolation the Court estimates its present value to be $4,292,947. She calculates the reversion value of the hotel in 2028 by dividing the projected 2028 NOI of $892,666 by an Exit Cap Rate of 9.00% (.09) which equals $9,918,511. The Court

14

estimates her calculation of the present value of the hotel's reversion value to be $3,373,030. The sum of the present value of the projected cash flow plus the present value of the hotel's reversion value is $7,665,977. From that amount, she deducts a remaining PIP expense estimate of $281,296 to reach a rounded As-Is Market Value of $7.4M.

In determining how much relative weight to give competing appraisals, it is appropriate for a court to examine and compare the appraisal methodology used by each appraiser. In this Court's view, there is no material distinction to be drawn between the two appraisals on the basis of methodology. Both appraisers based their valuations on the discounted cash flow analysis, using comparable sales as corroboration. Both appraisers indicated that this is the same methodology that potential purchasers and investors would likely rely upon.

So would a potential purchaser or investor share Ms. Owen's optimism that a projected stabilized occupancy rate of 71.0% is achievable, that operational efficiencies will be realized that will drive down the rooms expense ratio to 24.4%, and that the hotel will see steadily increasing net operating income over the next 10 years increasing to more than $800,000 per year? She thinks so. Mr. Jaeger disagrees, believing that purchasers and investors will view the hotel's recent performance as not merely a short-term trough from which it will emerge better and stronger, but that the disappointing financial performance of 2016 and 2017 represents the new normal.

There is no evidentiary basis to enable the Court to determine which set of projections would have more credence with market participants. Ms. Owen's projected stabilized occupancy rate is substantially less than what the hotel achieved just a few years ago. Her projected stabilized rooms expense ratio is within industry norms. Her projections certainly have a reasonably valid basis in light of the available data. Mr. Jaeger's more conservative projections

are consistent with the more recent performance data for the hotel. Market participants could reasonably find either set of projections to be credible. Accordingly, the appraisals will be given equal weight. For purposes of NCB's stay relief motion, the As Is Market Value of the Debtor's hotel property, as of December 22, 2017 is determined to be $6,550,000.

The parties also dispute whether the Debtor's cash on hand, consisting of room rents subject to NCB's lien, should be added to the hotel value as additional collateral value. NCB argues that since those funds will be needed to pay for completing the PIP work, they are "spoken for" and should not be counted as additional collateral value. The Court disagrees. The As Is valuation standard takes a snapshot of the value of all of the lender's collateral as of a particular time period or date, here, December 22, 2017. Those funds were not expended on the PIP project at that time and are properly included as NCB's collateral. The funds on hand as of the end of November, 2017 were $122,965 according to the Debtor's DIP report for that month. Accordingly, the total value of NCB's collateral is determined to be $6,672,965. This value is substantially less than the petition date balance due NCB, as asserted in Claim 12-1, of $7,259,253.67. Therefore, the Debtor has no equity in the hotel property for purposes of section 362(d)(2). The Court has no difficulty concluding that NCB has been undersecured for the entire time that the Debtor's bankruptcy case has been pending, so that NCB is not entitled to postpetition interest, fees, costs or charges under section 506(b).

The Debtor has the burden to prove that the property is necessary to an effective reorganization. See 11 U.S.C. 362(g)(2). This requires not merely a showing that if there is conceivably to be an effective reorganization, the property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect;* that there is "a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Tex. v.*

*Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 375-76 (1988). Early in a Chapter 11 case, especially during the period in which the debtor has the exclusive right to file a plan, courts are usually more lenient as to what is required of the debtor in order to sustain its burden. *Matter of Apex Pharmaceuticals, Inc.,* 203 B.R. 432, 441 (N.D. Ind. 1996).

In this case, the initial exclusivity period ended on June 7, 2017. The Debtor moved for and was granted an extension, which expired on August 27, 2017. No further extension was sought or granted. NCB's stay relief motion was filed on September 11, 2017, two weeks after the expiration of the extended period of exclusivity. More than three additional months elapsed before the motion was tried. As of the date of this Opinion, almost five months have elapsed since the extended exclusivity period expired. Therefore, the Debtor is not entitled to any leniency with respect to the effective reorganization element.

The Supreme Court has recognized that sale of substantially all of a debtor's assets as a going concern, whether through a liquidating plan or via a sale under section 363, is a legitimate purpose for a Chapter 11 case. *Florida Dept. of Rev. v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33, 37 n.2 (2008). Whether an "effective reorganization" as used in section 362(d)(2)(B) encompasses a liquidation in chapter 11 has not been addressed by the Seventh Circuit Court of Appeals. A number of courts have determined that liquidation may be an "effective reorganization" for stay relief purposes. *In re Kadlubek Family Revocable Living Trust,* 545 B.R. 660, 666 (Bankr. D.N.M. 2016); *In re Bloomingdale Partners,* 155 B.R. 961, 988 (Bankr. N.D.Ill. 1993); *In re Diplomat Elecs. Corp.,* 82 B.R. 688, 693 (Bankr. S.D.N.Y. 1988). See, also, *United Sav. Assn. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 808 F.2d 363, 371 n.14 (5th Cir. 1987), *aff'd,* 484 U.S. 365 (1988)("[T]here may be circumstances under which the debtor is able to satisfy the "effective reorganization" test of §362(d)(2) by showing that the

17

property at issue is necessary to an effective liquidation of the debtor under Chapter 11, as distinguished from an effective rehabilitation of the debtor.").

Assuming a liquidation may be an effective reorganization, a debtor bears the same burden to prove that an effective reorganization is in prospect, by presenting evidence of a reasonable possibility of a successful going concern liquidation within a reasonable time. The Debtor has not filed a liquidating plan, a sale motion or a motion to employ a broker. The Debtor commenced an anticipatory relationship with a broker, Sean Givens, who appeared at two hearings on November 6, 2017 and November 21, 2017. The Debtor has not filed a motion to employ Mr. Givens and he did not testify. At the trial, the Debtor and Mr. Matthews requested that stay relief be denied so that the Debtor would have more time to attempt to sell the hotel property, expressing the belief that completion of the PIP project and Ms. Owen's recent appraisal would enhance the hotel's marketability. On January 19, 2018, the Debtor's motion to hire and pay a contractor to complete the PIP improvements was granted without opposition.

In chapter 11 cases, where stay relief to permit foreclosure is at issue, debtors often express a desire to control the sale of the property with a reasonable belief that a higher price could be obtained through normal commercial marketing efforts rather than through foreclosure. A lack of equity in the property in question is not necessarily fatal so long as the secured creditor is adequately protected and the debtor is making demonstrable and timely progress toward a successful liquidation. See *Kadlubek,* 545 B.R. at 666-67. However, relief from the stay is warranted where the debtor fails to present evidence of such progress. *In re Biltwood Properties LLC,* 473 B.R. 70 (Bankr. M.D.Pa. 2012); *In re Western Sunset, LLC,* 2010 WL 2710579 (Bankr. S.D.Cal. 2010); *In re Mount Moriah Baptist Church, Inc.,* 2010 WL 1930937 (Bankr. S.D.N.Y. 2010)(if all the debtor can offer in response to a request for relief from the automatic

stay is the hope that sometime in the future some purchaser may appear on the horizon with a sufficiently substantial offer, it cannot be concluded that an effective reorganization is likely).

At the trial, Mr. Matthews expressed optimism about the Debtor's ability to sell or refinance the hotel property now that he had Ms. Owens' appraisal to use as a marketing tool. There is little evidence in the record, however, to demonstrate that the Debtor is making demonstrable progress toward that end. Mr. Givens was unable to produce a letter of intent or a term sheet from a potential purchaser, no motion has been filed to formally retain his services, and he was not called to testify at trial. A liquidating plan has not been filed or even suggested. Neither has a section 363 sale motion been filed. The Debtor still owes a large (almost $200,000) arrearage to Marriott and no apparent progress has been made to pay that down. The Debtor is now moving forward to complete the PIP improvements, but that can hardly be characterized as substantial progress toward a sale. Based on the record before this Court, the Debtor has failed to carry its burden to prove that an effective reorganization (including liquidation) is in prospect. NCB is entitled to relief from the automatic stay under section 362(d)(2). The stay relief order will be temporarily stayed by operation of Fed.R.Bankr.Pro. 4001(a)(3).

This Opinion constitutes this Court's findings of fact and conclusions of law. A separate order will be entered.

###